OPINION OF THE COURT
John R. Tenney, J.
The defendant, Louisiana-Pacific Corporation, owns and operates a wood pulp mill in Ketchikan, Alaska. The mill produces a by-product known as “rayon rejects”. These rejects can either be reprocessed or sold “as is”.
Plaintiff’s sole business was purchasing rejects from defendant for resale to Beauknit Fibers in Utica, New York. The parties followed standard procedure for several years prior to 1979 when defendant ceased doing business with Pulprint and started to ship directly to Beauknit and other users of rayon rejects.
As a standard procedure, each year plaintiff would estimate Beauknit’s requirements for the upcoming year and would forward this estimate to defendant in the form of a purchase contract or “reservation” contract. Plaintiff reserved approximately 3,000 tons of rejects each year. Deliveries were scheduled throughout the year but no annual price was set. Prices were negotiated each quarter depending upon current market conditions. The negotiated price allowed for a 2Vfe% “commission” to plaintiff. Beauknit was charged an additional amount by plaintiff.
Normally, the number of tons actually shipped corresponded to the annual reservation. However, in February, *729 1976, the reservation (referred to as purchase order P.0102) was never fulfilled because of a conflict between the parties. This seemed to be a one-time problem because regular deliveries were resumed in the summer of 1976.
The conclusion is there was some agreement between the parties despite the fact that plaintiff was not required to take delivery of the amount reserved, and the defendant was only required to ship if it determined not to reprocess the reject. However, there was an obligation to offer all rejects to plaintiff before selling them to any other buyers, up to the quantity required in the annual reservation.
In 1979, plaintiff reserved 3,000 tons (P.0107). However, only 120 tons were actually shipped to plaintiff. Defendant initially claimed that it simply had no rejects since the mill had been shut down by a labor dispute. However, shipments were not resumed even after the strike ended.
Russell Giles, defendant’s general manager of pulp sales, testified at a deposition as follows:
“In the relationship with Pulprint and (Beauknit) there were several reasons why our arrangement through Pulprint was no longer appropriate * * *
“Selling cost is an important item. In this particular case, we needed — I wanted to have more control over this business because we did not know the end-user. We were establishing at that time much stronger technical relationships with our end-users. Pulprint was of no assistance to us in establishing more sophisticated, technical relationships with (Beauknit). Furthermore, in this arrangement which is unlike any other Louisiana-Pacific has had, Pulprint was purchasing pulp from Louisiana-Pacific and reselling it to (Beauknit). So that we had no control over the price to the end-user, which we considered very unsatisfactory. And in addition, Pulprint was earning a commission.”
Plaintiff contends that receipt of the commission was not a breach of contract and that it is entitled to damages in the form of lost profits due to defendant’s breach. Defendant contends that regardless of the circumstance, there is no enforceable claim.
In the usual contract, the parties set both a firm price and a firm quantity, but these are not always essential *730 terms. Between merchants, the price problem is discussed in subdivision (1) of section 2-305 of the Uniform Commercial Code:
“The parties if they so intend can conclude a contract for sale even though the price is not settled. In such a case the price is a reasonable price at the time of delivery if
“(a) nothing is said as to price; or
“(b) the price is left to be agreed by the parties and they failed to agree; or
“(c) the price is to be fixed in terms of some agreed market or other standard as set or recorded by a third person or agency and it is not so set or recorded.”
Both the cases and the official code comments make it clear that a reasonable price is equivalent to the market price. (See, e.g., Huron Milling Co. v Hedges, 257 F2d 258; Carey Lithograph Co. v Magazine & Book Co., 70 Misc 541; Uniform Commercial Code, § 2-305, Comment 1.)
The “gap-filler” for the quantity term is found in subdivision (1) of section 2-306 of the Uniform Commercial Code which states: “A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that no quantity unreasonably disproportionate to any stated estimate or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.”
In applying these provisions, there is sufficient evidence to ascertain a quantity and a price and thus determine damages. The maximum amount which defendant was obligated to ship was 3,000 tons if it was available. The evidence discloses that aside from two carloads shipped to Pulprint in 1979, defendant shipped 931 tons to Beauknit and 779 tons to other buyers.
The amount shipped to Beauknit does not establish the maximum quantity which would have been shipped to plaintiff. There was a worldwide shortage of pulp products in 1979, including rayon rejects. Most vendees were able to obtain only a portion of their needs. Since the terms of the reservation called for shipment of 3,000 tons prior to any sales to other parties, the amount shipped to Beauknit is *731 not controlling. Plaintiff requested defendant’s entire output up to 3,000 tons, and it is that amount which sets the maximum measure of damages. Thus, the plaintiff may recover lost profits on 1,730 tons.
The price term is somewhat more complicated as the price which defendant sold varied throughout the year. Furthermore, although there is evidence as to the amount shipped to Beauknit, and the dates of delivery, there is no documentary evidence as to the price. However, since there were shipments to other vendees at approximately the same times which include prices, these can be used to establish the reasonable market prices for purposes of section 2-305 of the Uniform Commercial Code.
In summary, plaintiff is entitled to recover damages in the amount of $15,743.75 calculated as follows:
Shipment Market Shipment Lost
Date Vendee Tons Price Value % Profit
3/17/79 Central Natl. 333 $300 99,900 .025 $2,497.50
Zucker, Inc.
3/20/79 n 131 300 39,300 .025 982.50
4/3/79 it 127 300 38,100 .025 952.50
8/22/79 Balkley Dunton 63 350 22,050 .025 551.25
& Co.
11/22/79 It 63 400 25,000 .025 630.00
12/22/79 It 62 400 24,800 .025 620.00
11/22/79 Beauknit 315 400 126,000 .025 3,150.00
12/11/79 II 316 400 126,400 .025 3,160.00
12/22/79 It 320 400 128,000 .025 3,200.00
$15,743.75