**COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC.; Jackson Coca–Cola Bottling Company; Dixie Coca–Cola Bottling Company, Incorporated; New Bern Coca–Cola Bottling Works, Inc.; Plymouth Coca–Cola Bottling Company, Incorporated; Owensboro Coca–Cola Bottling Company, Inc.; Sacramento Coca–Cola Bottling Co., Inc.; Coca–Cola Bottling Company of Shelbyville, Inc.; Beaver Coca–Cola Bottling Co.; Quaker State Coca–Cola Bottling Company; The Cleveland Coca–Cola Bottling Company, Inc.; Keystone Coca–Cola Bottling Company; Central Coca–Cola Bottling Company, Inc.; Reading Coca–Cola Bottling Works; Coca–Cola Bottling Company of Shreveport, Inc. (formerly Star Bottling Works, Ltd.); The Coca–Cola Bottling Company of Fort Smith, a partnership; Texarkana Coca–Cola Bottling Company; Coca–Cola Bottling Company; Las Cruces Coca–Cola Bottling Company; West Plains Coca–Cola Bottling Company; The Coca–Cola Bottling Company of Tucson, Inc.; Hattiesburg Coca–Cola Bottling Company; Magnolia Coca–Cola Bottling Company, Inc.; Coca–Cola Bottling Company of Tulsa, Inc.; Ouachita Coca–Cola Bottling Company, Inc.; Natchez Coca–Cola Bottling Co., Inc.; Wichita Coca–Cola Bottling Co.; Coca–Cola Bottling**

---

Co. (North Dakota); Marshall Coca–Cola Bottling Co. Liquidating Trust; Permian Coca–Cola Bottling Co.; Scioto Coca–Cola Bottling Co.; Richmond Coca–Cola Bottling Co.; Coca–Cola Bottling Co. of Kennett (a partnership); Coca–Cola Bottling Co. of Jamestown; Streator Coca–Cola Bottling Co.; Texas Coca–Cola Bottling Co.; Jefferson City Coca–Cola Bottling Co.; Coca–Cola Bottling Co., Inc., Alexandria, MN; Deming Coca–Cola Bottling Co.; Trenton Coca–Cola Bottling Co.; Macon Coca–Cola Bottling Co.; Mary Louise Goodrich; Mary Louise Kay Robinson, individually and as trustee of the Kendall family inter vivos trust; Ann Kay Hobson Haack, individually and as trustee of the Kendall family inter vivos trust; John K. Hobson; Margaret Dodge Hobson, individually and as trustee of the Kendall family inter vivos trust (Subst. for Natchez Coca–Cola Bottling Co., Inc.); Oliver C. Hutaff, Jr., as Trustee under Shareholders' Lawsuit Trust Agreement (Subst. for Wilmington Coca–Cola Bottling Works, Inc. and Kelford Coca–Cola Bottling Works, Inc.)

v.

The COCA–COLA COMPANY, a Delaware corporation, Coca–Cola Bottling Co. of Mt. Pleasant; Coca–Cola Bottling Co. of Muskegeon; Coca–Cola Bottling Co. of Dickinson; Laredo Coca–Cola Bottling Company, Inc., Intervenors in D.C.,

Coca–Cola Bottling Company of Magnolia; Sacramento Coca–Cola Bottling Company; Coca–Cola Bottling Company of Elizabethtown, Inc. (also successor by merger to Coca–Cola Bottling Co. of Owensboro); Coca–Cola Bottling Company of Shelbyville; Trenton Coca–Cola Bottling Company; Plymouth Coca–Cola Bottling Company; Coca–Cola Bottling Company of Dickinson; Coca–Cola Bottling Co. of Jamestown; Coca–Cola Bottling Company of Williston; Cleveland Coca–Cola Bottling Company; Coca–Cola Bottling Company of Lehigh Valley (formerly known as Bethlehem); Laredo Coca–Cola Bottling Company; Central Coca–Cola Bottling Company; Love Bottling Company; Coca–Cola Bottling Company of LaCrosse; Arkansas–Georgia Company (also known as Nashville); Coca–Cola Bottling Company of Streator; Natchez Coca–Cola Bottling Company; Coca–Cola Bottling Company of Jefferson City; Coca–Cola Bottling Company of Macon; Coca–Cola Bottling Company of Deming; Coca–Cola Bottling Company of Tulsa; Coca–Cola Bottling Company of Brownsville (RGV); Coca–Cola Bottling Company of San Angelo; Las Cruces Coca–Cola Bottling Company; Coca–Cola Bottling Company of Tucson; Coca–Cola Bottling Company (Alexandria); Coca–Cola Bottling Company of Marshall; Oliver C. Hutaff, Jr., as Trustee under Shareholders' Lawsuit Trust Agreement (Subst. for Wilmington Coca–Cola Bottling Works, Inc. and Kelford Coca–Cola Bottling Works, Inc.), Appellants.

COCA–COLA BOTTLING COMPANY OF ELIZABETHTOWN, INC.; Jackson Coca–Cola Bottling Company; Dixie Coca–Cola Bottling Company, Incorporated; New Bern Coca–Cola Bottling Works, Inc.; Plymouth Coca–Cola Bottling Company, Incorporated; Owensboro Coca–Cola Bottling Company, Inc.; Sacramento Coca–Cola Bottling Co., Inc.; Coca–Cola Bottling Company of Shelbyville, Inc.; Beaver Coca–Cola Bottling Co.; Quaker State Coca–Cola Bottling Company; The Cleveland Coca–Cola Bottling Company, Inc.; Keystone Coca–Cola Bottling Company; Central Coca–Cola Bottling Company, Inc.; Reading Coca–Cola Bottling Works; Coca–Cola Bottling Company of Shreveport, Inc. (formerly Star Bottling Works, Ltd.); The Coca–Cola Bottling Company of Fort Smith, a partnership; Texarkana Coca–Cola Bottling Company; Coca–Cola Bottling Company; Las Cruces Coca–Cola Bottling Company; West Plains Coca–Cola Bottling Company; The Coca–Cola Bottling Company of Tucson, Inc.; Hattiesburg Coca–Cola Bottling Company; Magnolia Coca–Cola Bottling Compa-

388

ny, Inc.; Coca–Cola Bottling Company of Tulsa, Inc.; Ouachita Coca–Cola Bottling Company, Inc.; Natchez Coca–Cola Bottling Co., Inc.; Wichita Coca–Cola Bottling Co.; Coca–Cola Bottling Co. (North Dakota); Marshall Coca–Cola Bottling Co. Liquidating Trust; Permian Coca–Cola Bottling Co.; Scioto Coca–Cola Bottling Co.; Richmond Coca–Cola Bottling Co.; Coca–Cola Bottling Co. of Kennett (a partnership); Coca–Cola Bottling Co. of Jamestown; Streator Coca–Cola Bottling Co.; Texas Coca–Cola Bottling Co.; Jefferson City Coca–Cola Bottling Co.; Coca–Cola Bottling Co., Inc., Alexandria, MN; Deming Coca–Cola Bottling Co.; Trenton Coca–Cola Bottling Co.; Macon Coca–Cola Bottling Co.; Mary Louise Goodrich; Mary Louise Kay Robinson, individually and as trustee of the Kendall family inter vivos trust; Ann Kay Hobson Haack, individually and as trustee of the Kendall family inter vivos trust; John K. Hobson; Margaret Dodge Hobson, individually and as trustee of the Kendall family inter vivos trust (Subst. for Natchez Coca–Cola Bottling Co., Inc.); Oliver C. Hutaff, Jr., as Trustee under Shareholders' Lawsuit Trust Agreement (Subst. for Wilmington Coca–Cola Bottling Works, Inc. and Kelford Coca–Cola Bottling Works, Inc.)

v.

The COCA–COLA COMPANY,
a Delaware corporation,

Coca–Cola Bottling Co. of Mt. Pleasant; Coca–Cola Bottling Co. of Muskegeon; Coca–Cola Bottling Co. of Dickinson; Laredo Coca–Cola Bottling Company, Inc., Intervenors in D.C.,

The Coca–Cola Company, Appellant.

Nos. 91–3496, 91–3498.

United States Court of Appeals,
Third Circuit.

Argued March 10, 1992.

Decided Feb. 17, 1993.

Roger N. Nanovic, Nanovic Law Offices, Jim Thorpe, PA, for Coca–Cola Bottling Co. of Elizabethtown, Inc.

Jesse A. Finkelstein, Richards, Layton & Finger, Wilmington, DE, and Emmet J. Bondurant II, (Argued), Jane E. Fahey, (Argued), Jeffrey D. Horst, Bondurant, Mixson & Elmore, Atlanta, GA, for Coca–Cola Bottling Co. of Magnolia, et al.

Richard D. Allen, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, and Frank C. Jones (Argued), Chilton Davis Varner, Dwight J. Davis (Argued), King & Spalding, Atlanta, GA, for The Coca–Cola Bottling Company, a Delaware corp.

Before HUTCHINSON, ALITO and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

These consolidated appeals are from orders the United States District Court for the District of Delaware entered in one of three related actions[1] concerning the contracts between The Coca–Cola Company (the Company) and some of its bottlers who have persisted in refusing the Company's proposed amendments to its agreements to supply the bottlers' requirements of Coca–

---

1. Two of these actions, *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, C.A. No. 83–95, and *Alexandria Coca–Cola Bottling Co. v. Coca–Cola Co.*, C.A. No. 83–120 (collectively referred to as the *"diet Coke"* cases), 769 F.Supp. 671 (D.Del. 1991), arise from disputes involving introduction by the Company of its new diet product, diet Coke, in 1983. An appeal of the *Shreveport* case is the subject of our companion opinion in *Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 988 F.2d 414 (3d Cir.1993). There was no appeal in the *Alexandria* case.

Cola bottling syrup.[2] In the appeal at our Docket No. 91–3496, eighteen bottlers of the soft drink known as Coca–Cola appealed an order of the United States District Court for the District of Delaware dismissing their amended Count Two claim for declaratory and injunctive relief.[3] The relief sought would have required the Company to supply them with Coca–Cola syrup (herein the syrup) sweetened with high-fructose corn syrup (HFCS) under contracts that license them to market bottled Coca–Cola in a particular territory. Their licenses had their roots in the terms of an 1899 national franchise the Company had granted the predecessor of the bottlers' licensors. That franchise was, however, amended from time to time and ultimately modified by agreements incorporated into two 1921 Consent Decrees (herein Consent Decrees) which settled a 1920 dispute between the Company and the bottlers' licensors.

In its cross-appeal at Docket No. 91–3498, the Company challenges the order of the district court awarding a total of $20,-742,398.20 in compensatory damages and prejudgment interest for breach of contracts to the eighteen bottlers who continue to seek injunctive relief in No. 91–3496 and

twelve other bottlers who formerly bottled and distributed Coca–Cola (herein the "former bottlers"). These thirty bottlers claimed in Count One of their complaint that the Company had breached its contractual obligations to them when it unilaterally substituted syrup sweetened with the cheaper HFCS for syrup sweetened with the more expensive cane or beet sugar they claim that the Consent Decrees require. The Consent Decrees followed a 1920 law suit the bottlers' licensors brought against the Company, after World War I fluctuations in the supply and price of cane sugar, then the exclusive sweetener used for the syrup, ignited a heated dispute between the parties. The bottlers' individual contracts are similar in all material respects and their terms derive their meaning from the 1899 contract, as ultimately modified by the Consent Decrees.

The primary issue in the appeal of the bottlers at No. 91–3496 and the Company's cross-appeal at No. 91–3498, as well as the companion appeal at No. 91–3497 of another somewhat overlapping set of bottlers who claim entitlement to diet Coke syrup, is what type of syrup the Company is contractually obligated to provide its bottlers

---

**2.** For shortened reference, citations to the published opinions of the district court in this case will be as follows: *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 95 F.R.D. 168 (D.Del.1982) (*Coke I*); *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 98 F.R.D. 254 (D.Del.1983) (*Coke II*); *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 654 F.Supp. 1388 (D.Del.1986) (*Coke III*); *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 654 F.Supp. 1419 (D.Del.1987) (*Coke IV*); *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 668 F.Supp. 906 (D.Del.1987) (*Coke V*); *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 696 F.Supp. 57 (D.Del.1988) (*Coke VI*); *Coca–Cola Bottling Co. of Elizabethtown v. Coca–Cola Co.*, 769 F.Supp. 599 (D.Del.1991) (*Coke VII*).

**3.** The bottlers who were plaintiffs in *Coke VII* and participate in this appeal are as follows, with their state of incorporation or principal place of business indicated in parentheses. Those who are also participating in the appeal of *diet Coke VII* are signified by an asterisk:

Coca–Cola Bottling Co. of Magnolia (AK)*, Sacramento Coca–Cola Bottling Co. (CA)*, Coca–Cola Bottling Co. of Elizabethtown (KY)*, Coca–Cola Bottling Co. of Shelbyville (KY)*, Trenton Coca–Cola Bottling Co. (MO), Kelford Coca–Cola Bottling Co. (NC)*, Plymouth Coca–Cola Bottling Co. (NC)*, Wilmington Coca–Cola Bottling Works (NC)*, Coca–Cola Bottling Co. of Dickinson (ND)*, Coca–Cola Bottling Co. of Jamestown (ND)*, Coca–Cola Bottling Co. of Williston (ND)*, Cleveland Coca–Cola Bottling Co. (OH), Coca–Cola Bottling Co. of LeHigh Valley (PA), Laredo Coca–Cola Bottling Co. (TX), Central Coca–Cola Bottling Co. (VA), Love Bottling Co. (OK)*, Coca–Cola Bottling Co. of LaCrosse (WI)*, Arkansas–Georgia (AK), Coca–Cola Bottling Co. of Streator (IL), Natchez Coca–Cola Bottling Co. (MS)*, Coca–Cola Bottling Co. of Jefferson City (MO), Coca–Cola Bottling Co. of Macon (MO), Coca–Cola Bottling Co. of Deming (NM), Coca–Cola Bottling Co. of Tulsa (OK)*, Coca–Cola Bottling Co. of Brownsville (TX), Coca–Cola Bottling Co. of San Angelo (TX)*, Las Cruces Coca–Cola Bottling Co. (NM)*, Coca–Cola Bottling Co. of Tucson (AZ)*, Coca–Cola Bottling Co. (Alexandria) (MN), and Coca–Cola Bottling Co. of Marshall (TX)*.
*Coke VII*, 769 F.Supp. at 605–06; *diet Coke VII*, 769 F.Supp. 671, 679–80 (D.Del.1991).

under the bottling contracts derived from the 1899 franchise, as amended and ultimately modified by the Consent Decrees. The district court held that two key terms in the Consent Decrees, "sugar" and "syrup," were ambiguous and, after evidential hearings, interpreted sugar in the light of the parties' practices over the years. The district court's findings concerning the meaning the parties intended to give the term "sugar" are the subject of *Coke III* and its findings concerning the parties' intent in using the term "syrup" are made in *Coke VII.*

In amended Count Three of their complaint, the bottlers sought additional damages because, they claimed, the Company overpriced the naturally sweetened syrup it was selling to them by determining the market price for sugar contrary to the pricing formula the Consent Decrees set for syrup. In Count Four, the bottlers claimed a share of monies the Company received in settlement of an antitrust action it had brought against the major refiners of sugar.[4]

We hold that the district court did not err in determining that the Consent Decrees and the resulting contracts with the bottlers covered only syrup sweetened with 5.32 pounds per gallon of cane or beet sugar. We will therefore affirm the district court's order dismissing the bottlers' demands for syrup sweetened with HFCS. We also agree with the district court that the Company breached its contracts with the bottlers when it began unilaterally supplying them with syrup sweetened with HFCS. Nevertheless, because the HFCS-sweetened syrup was comparable in all material respects to the syrup made with 5.32 pounds per gallon of cane or beet extracted sugar, we also hold that the bottlers have not shown that they suffered any loss of economic expectancy as a result of this breach. Therefore, the district court's award of compensatory damages to the bottlers on Count One of their complaint, including its award of pre-judgment interest, will be vacated and the case remanded with instructions to substitute therefor an award of $1.00 in nominal damages to each of the bottlers who are cross-appellees at our Docket No. 91–3498. In all other respects we will affirm the orders of the district court.

## I.

### A.

The history of Coca–Cola is essential background to our analysis of this case.[5] The story begins in 1886 when an Atlanta pharmacist, Dr. John Smyth Pemberton, developed the formula for Coca–Cola. Soon afterward, Asa G. Candler, also a pharmacist and the owner of a wholesale drug company, purchased an interest in the formula and the trademark and formed the Company to manufacture and market Coca–Cola syrup to drugstores for use in a fountain beverage.

In 1899, two Chattanooga lawyers, B.F. Thomas and J.B. Whitehead, bought the rights to receive Coca–Cola syrup at a fixed price for vending in "bottles or other receptacles" throughout the United States with the exception of Connecticut, Maine, Massachusetts, Mississippi, New Hampshire, Rhode Island, Texas and Vermont. Thomas and Whitehead also received the exclusive right to use the trademark "Coca–Cola" on bottles in the territories covered by the contract. The bottling rights the Company conveyed to Thomas and Whitehead were exclusive, not only of all other potential bottlers, but also of the Company itself, which reserved only the exclusive right to distribute its syrup for use at soda fountains in non-bottled soft drinks and to manufacture bottling syrup for sale to Thomas and Whitehead. As part of the deal, Thomas and Whitehead

---

4. The vast majority of the bottlers who once operated under the contracts as amended by the Consent Decrees have already agreed to terms under an amendment the Company first offered in 1978. The parties to these appeals have refused to accept that offer.

5. For greater detail concerning the historical facts of this litigation, the reader is referred to *Coke VII,* 769 F.Supp. at 606–13, and *Coke VI,* 696 F.Supp. at 61–68. This statement of facts is drawn, at times verbatim, from these opinions.

agreed to buy their requirements for Coca–Cola bottling syrup from the Company. Under these exclusive bottling contracts (the 1899 Contracts), Whitehead and Thomas agreed to "establish in the city of Atlanta, as soon as the necessary machinery and buildings can be obtained, a bottling plant for the purpose of bottling a mixture of Coca–Cola syrup preparation with carbonic acid and water." *Coca–Cola Bottling Co. v. Coca–Cola Co.*, 269 F. 796, 800 (D.Del. 1920) (*Coke 1920*) (quoting 1899 contract).

Thomas and Whitehead formed the "Coca–Cola Bottling Company," a Tennessee corporation, in December 1899. Shortly after its formation, they decided to assign some of their rights under the 1899 contract to outside bottlers. Thomas and Whitehead soon disagreed about the terms of the contracts between their company and the bottlers who would actually bottle Coca–Cola. They decided to divide the Coca–Cola bottling business and go their separate ways. Thomas retained the original Tennessee bottling company (the "Thomas Company") and an exclusive territory for the business of bottling Coca–Cola in approximately fifteen states. The exclusive right to bottle Coca–Cola in the remaining states that were the subject of the grant from the Company went to Whitehead. Whitehead and a new partner, J.T. Lupton, also named their bottling company "The Coca–Cola Bottling Company." To avoid confusion, we will call it the "Whitehead–Lupton Company." The 1899 Contract with the Company for the supply of bottling syrup was amended to reflect this separation.

As consumer demand for bottled Coca–Cola escalated, the two new bottling companies found themselves unable to meet it. In order to fulfill their obligations under the contract, they again subdivided their territories and entered into licensing contracts with bottlers who bottled, promoted, and sold Coca–Cola out of their own bottling plants in various exclusive territories assigned to them. The Thomas Company and the Whitehead–Lupton Company, the "parent bottlers," became largely licensors of the exclusive right that the Company had given them to market bottled Coca–Cola. Their licensees, the actual bottlers, performed the tasks of manufacture, shipment, and bottling.[6] The parent bottlers' primary functions became the recruiting of actual bottlers to meet the rising demand for bottled Coca–Cola and continued expansion of the market for that product.

In 1919, a banking syndicate purchased the Company. The syndicate converted it into a Delaware corporation which assumed the old Georgia company's previous obligations to the parent bottlers. It did not directly contract with the parent's licensees, the actual bottlers of Coca–Cola. One year later, in 1920, smoldering tensions between the Company and the bottlers over the content and pricing of the syrup erupted into litigation, prosecuted primarily by the parent bottlers.

B.

The 1920 litigation, like the World War that engendered it, led only to a prolonged armistice. In order to understand the impact of the 1920 litigation on the current dispute, it is helpful to set out several changes that were made in the formula for Coca–Cola bottling syrup between 1899 and 1920. Prior to 1906, the syrup was sweetened with a combination of sugar and saccharin. In 1906, Congress passed the Pure Food and Drug Act, following which the Company began using granulated sugar, in lieu of saccharin which was banned by the Act. Refined granulated sugar, a form of sucrose, became the most expensive ingredient used in the manufacture of the syrup. Accordingly, the parent bottlers and their licensees agreed to an increase in the price of syrup to reflect the higher cost attendant on the use of cane sugar as the sole sweetener for Coca–Cola bottling syrup. A second change was the introduction of different formulae for fountain syrup and bottlers' syrup. This change resulted in the

6. The bottlers who are parties to this appeal and cross-appeal, as well as those who are parties to

the diet Coke appeal, are actual bottlers.

Company's use of more sugar in bottlers' syrup than in fountain syrup.

World War I severely affected the sugar market and, with it, the Company's cost of producing syrup. Among other things, the war brought rigid price controls and rationing. The Company and its bottlers were permitted to buy only fifty percent of their sugar requirements. The removal of price controls at the end of the war, combined with a continuing shortage of sugar, produced a three-fold rise in the price of sugar, from nine cents a pound in September 1919 to over twenty-seven cents a pound in June 1920. Sugar rationing during the war had, in the meantime, spurred experimentation with sweeteners other than the sucrose obtained by refining cane or beet sugar. A division of the United States Department of Agriculture tested corn syrup and corn sugar for suitability as substitutes for conventional granulated sugar and concluded that the substitutes "[could] be used to replace one-fourth to one-half of the amount of sugar ordinarily used [in soft drinks], thereby effecting a saving of approximately 50,000 tons of sugar a year." *Coke VI*, 696 F.Supp. at 63 (quotation omitted). At approximately the same time, the Company began substituting corn syrup for sugar in order to attempt to meet demand, but the bottlers found that the use of the corn syrups then available adversely affected the quality of their product.

### C.

In 1919, because of the wartime rise in sugar prices, the parent bottlers agreed to permit the Company to pass on sugar price increases in excess of nine cents per pound. The Company was not satisfied. In 1920, it sought new contracts with the parent bottlers that would allow it to raise syrup prices on the basis of all its costs in manufacturing Coca–Cola bottling syrup. The bottlers were unwilling to agree to such a cost plus contract unless the Company gave them the right to obtain information on its manufacturing costs. The Company was unwilling. Instead, it stood on "the integrity and good faith of The Coca–Cola Company." *Coke VII*, 769 F.Supp. at 609.

The parent bottlers then rejected the Company's proposal for flexible pricing. Stung by this rejection, the Company informed the parent bottlers that its contracts with them were terminable at will. The parent bottlers replied with a demand that the Company acknowledge that their contracts were perpetually binding. The Company responded with a notice that the parent bottlers' contracts would be terminated as of May 1, 1920.

The two principal parent bottlers, the Thomas Company and the Whitehead–Lupton Company, filed suit against the Company in Georgia. The suit was shortly withdrawn and refiled in the United States District Court for the District of Delaware on June 1, 1920. The parent bottlers sought to enjoin the Company from terminating their contracts. Six actual bottlers from the Whitehead–Lupton territory intervened in their support. What occurred during the pendency of that litigation is described in *Coke III*, 654 F.Supp. at 1394–95:

> On June 10, 1920, the parties to the Delaware litigation agreed to entry of an order requiring the Company to supply the parent bottlers' and actual bottlers' requirements of Coca–Cola Bottlers Syrup during the pendency of the litigation. Under the terms of the Order, the price of the syrup paid by the actual bottlers to the parent bottlers was fixed at $1.72 per gallon for 5 months (until November 1, 1920), by which time it was anticipated a final decision on the applications for interlocutory injunctions would have been rendered. The Order further provided that if the final decision had not issued by November 1, 1920, the syrup price would be increased or decreased from the $1.72 level based upon increases or decreases in the Company's actual costs of manufacture of the syrup.
>
> During the negotiations leading to the June 10 Order, it appears the Company failed to disclose fully that it had entered into substantial long-term sugar contracts at prices near the top of the market. The bottlers were given to understand, from representations made in an affidavit filed on June 7, 1920 by Charles H. Candler, then Chairman of the Board

of The Coca–Cola Company, that the Company had favorable long-term sugar contracts "very much lower than the present market price." Charles Rainwater, in a letter to Candler dated January 14, 1921, recollected Candler's statements to the bottlers:

[Y]ou represented that The Coca–Cola Company had but one written contract, which expired in about three weeks, and one verbal contract, under which the market price each Monday morning was controlling.

Although the price of sugar dropped steadily from its peak in June, 1920, the price of syrup to the parent and actual bottlers under the June 10, 1920 Order remained fixed. Thus, while competing soft-drink prices fell, the retail price of Coca–Cola remained high. Actual bottlers suffered a loss in sales volume. The Chairman of The Coca–Cola Company reported that the Company's total sales volume of syrup (which included both bottle and fountain syrup) declined 53% in September, 1920 and 50% in October, 1920, because of the high price of syrup.

The bottlers expected relief on November 1, based on their understanding of the Company's sugar contracts. Instead, with the market price of sugar continuing to fall, the Company announced a price increase for its syrup in November, 1920, in order to recoup the cost of its inventories of high-priced sugar. The Company also announced price increases in December, 1920, and January, 1921. The bottlers by agreeing in the June 10 Order to a price for syrup based upon the Company's total manufacturing cost quickly discovered they had unwittingly exposed themselves to and insulated the Company from the hazards of the marketplace. The Company required the bottlers to pay for the Company's poor judgment in overpurchasing high-priced sugar, while it continued to receive fixed profits per gallon of syrup. Both The Coca–Cola Company and especially the actual bottlers found themselves in a precarious economic position while maintaining an increasingly antagonistic negotiating posture.

The Company represented its costs of manufacture under the June 10 Order had increased because of long-term sugar contracts at high prices. The parent bottlers, in disbelief, demanded verification of the Company's figures. The bottlers' audit revealed discrepancies, and the Company and the parent bottlers were unable to reconcile their figures or even agree on items of overhead to be included in the cost calculation. When the Company in January 1921 announced an estimated February cost of manufacture of $1.85, the bottlers took new action. In February, a parent bottler and actual bottlers filed supplemental complaints accusing the Company of fraud in the negotiation of and operation under the Order and sought appointment of a special master to determine the syrup cost under the terms of the Order.

*Id.* (citations omitted).

In *Coke 1920*, the district court granted the parent bottlers' motions for preliminary injunctions, declaring that their contracts with the Company were perpetual and that the Company had sold them property rights in the bottling of Coca–Cola. *See Coke 1920*, 269 F. at 816. The Company appealed the decision to this Court. On July 6, 1921, while the appeal was pending, the Company executed separate settlement agreements with both the Whitehead–Lupton Company and the Thomas Company. The district court formally incorporated those agreements into Consent Decrees on October 4, 1921.[7]

The Consent Decrees amended and clarified the contracts between the Company and the parent bottlers. Paragraph One of the settlement agreement so incorporated declared "that the primary obligation of all parties hereto, as well as all other individuals and Bottling Companies who employ the name Coca–Cola ... is to promote the

7. The decrees incorporating the settlement agreements are identical for all practical purposes on this appeal. The settlement agreement between the Company and the Thomas Company is reproduced in pertinent part in the Appendix to this opinion.

sale of Coca–Cola." Joint Appendix (App.) at 4415.

Paragraph Two memorialized the parties' agreement that the original contracts between them "shall remain of full force and effect" and "be perpetual," except as "modified" herein, and provided that the parent bottlers must obtain the consent of the Company to an assignment made under the contract. *Id.*

Paragraph Five fixed the price of syrup to be offered by the Company to the parent bottlers at $1.17½ per gallon, and established a formula to accommodate changes in the price of sugar. The parties designed the pricing formula so that upward changes in it would be triggered when the market price of sugar rose more than seven cents per pound over the price prevailing at the time the settlement was made. For every one cent increase in the price of sugar above the seven cents per pound increase, the bottlers agreed to pay six additional cents per gallon of syrup.[8] The pricing formula was "to include all possible increases in the cost of producing such syrup" by the Company, other than those resulting from arbitration.[9] *Id.* at 4417.

Paragraph Six obliged the parent bottlers to sell syrup to the actual bottlers at a maximum current price of $1.30 per gallon, "[i]n order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages." *Id.* It also provides that the initial $1.30 per gallon price of syrup to the actual bottlers would increase by six cents per gallon for every one cent per pound increase in the market price of sugar over and above an initial seven cents per pound increase. *Id.* This provision is similar to Paragraph Five of the Consent Decree which requires a similar increase in the price of syrup to the parent bottlers.

Paragraph Seven provides a method for calculating the market price of sugar. The parties agreed that sugar's market price would be determined quarterly, the first seven days of each quarter, "by averaging the market price of standard granulated sugar ... as quoted at [the ten largest domestic refineries]." *Id.* at 4417–18.

Paragraph Ten contains the Company's promise that "the syrup sold and furnished by it to the party of the first part [the parent bottlers] is to be high grade standard Bottlers Coca–Cola Syrup." *Id.* at 4420. Paragraph Ten also provides that the syrup furnished to the bottlers "shall contain not less than five and thirty two one hundredths (5.32) pounds of sugar to each gallon of syrup." *Id.*

The 1899 agreement between Thomas and Whitehead and the Company, as amended by the 1921 Consent Decrees, does not give any precise definition of the Coca–Cola syrup that is to be supplied, and neither the bottlers who are parties to this case concerning natural sweeteners, nor those who are parties to the diet Coke case, contend on appeal that the term syrup as used in the Company's agreement with the parent bottlers adds anything to the 1921 agreement's description of the syrup in terms of its sugar content. The bottlers in the instant case do argue, however, that the required "standard" Coca–Cola bottling syrup mentioned in Paragraph Ten of the Agreement, commonly used by all or substantially all Coca–Cola bottlers, is the HFCS-sweetened syrup because that is the syrup the Company now provides to approximately ninety-seven percent of its bottlers.[10]

### D.

By 1975 the Company had acquired the parent bottlers and assumed their obligations to their licensees, the actual bottlers. In 1978, the Company proposed to

---

**8.** The price would rise on the same basis in the event of a fractional advance in the price of sugar. For example, if the price of sugar rose from seven cents to seven and one-half cents per pound, the price of syrup would also rise from $1.17½ to $1.23½ per gallon.

**9.** The arbitration provisions are set out in paragraphs 3, 12 and 13. The parties to this case

and the diet Coke case have eschewed arbitration.

**10.** As discussed *infra,* most of these bottlers accepting HFCS are no longer parties to this case since they have agreed to the Company's proposed 1978 amendment to their contracts.

amend its bottlers' contracts to substitute a new pricing formula for its syrup (the "1978 Amendment"). The new formula continued to use a "sugar element" as the "base element" but added a factor based on the Consumer Price Index, instead of the "market price" of sugar. As discussed *supra*, the impetus for the "market price" term in the Consent Decrees came from the bottlers' disastrous experience with the Company's sugar purchases following World War I and during the first several months of the 1920 litigation. Tying the syrup price to the market price of sugar served the dual purpose of transferring the economic risks associated with long term sugar purchases from the bottlers to the Company and of providing an objectively verifiable price for the cost of sugar. *Coke III*, 654 F.Supp. at 1408.

Even in the period immediately following the entry of the Consent Decrees, the parties disagreed over whether the syrup should be priced at the "quoted" or "list" price, or at the actual selling price. This disagreement went unresolved. The Company's practice at that time, however, as reflected in a 1956 memorandum from C.W. Hodgson, Company Vice–President to the head of the Company's Purchasing Department (hereinafter "Hodgson Memorandum"), was to use the actual selling price rather than the higher list price. *Id.* at 1416. The Company determined actual selling prices through inquiries of the refiners. In 1969, the Company discontinued this practice and began using the refiners' official list prices to calculate the market price.

In January 1980, the Company started using a new, cheaper sweetener, HFCS, in place of the sucrose contained in refined, granulated cane or beet sugar. HFCS is made "by hydrolysis of corn starch by chemical enzymes." *Coke VI*, 696 F.Supp. at 67 (quotation omitted). At first, HFCS constituted fifty percent of the sweetener used in the syrup, but eventually the Company eliminated sucrose entirely.

The 1978 amendment "also contained a provision that in the event the Company modified the formula of Coca–Cola Bottlers Syrup to replace sugar with 'another sweetening ingredient,' the resulting savings would be passed through to amending bottlers." *Coke III*, 654 F.Supp. at 1395. From 1978 until 1987, when the Company withdrew it, most of the bottlers accepted the proposed 1978 amendment and had their contracts modified accordingly. Out of an original group of 102 bottlers, only forty-two remained in this case by the time the class issues were tried in 1983 and, as stated, only thirty participate in this appeal. *See supra* n. 3. Eighteen of these thirty participating bottlers continue to buy syrup for bottled Coca–Cola under the original contracts as modified by the Consent Decrees or contracts that closely resemble those original agreements. They seek both damages and injunctive and declaratory relief. The other twelve have sold or abandoned their contracts and seek only damages for breach.

For a time, the Company sold HFCS-sweetened syrup to both those bottlers who had accepted the 1978 amendment it proposed and the bottlers who insisted on operating under the 1921 agreements. The bottlers who agreed to amend their contracts received a "pass-through" of the savings to the Company from the use of HFCS, which is cheaper than the sucrose that is obtained from cane or beet sugar. The bottlers who refused to amend their contracts did not receive that particular price advantage. Despite the pass-through provision, the bottlers with amended contracts pay a higher price for syrup, due at least in part to the amended contracts' inclusion of promotional costs in the syrup's price base, a cost not included in the 1921 agreement's pricing formula. *See Coca–Cola Bottling Co. of Shreveport v. Coca–Cola Co.*, 563 F.Supp. 1122, 1126 n. 14 (D.Del.1983).

## II.

The bottlers filed the present actions in 1981 following the Company's 1980 decision to substitute HFCS for granulated sugar in the syrup for bottled Coca–Cola. The parties' differences concern the nature of Coca–Cola's bottling syrup and the appro-

priate price for HFCS, as well as alleged pre-existing and continuing overcharges for syrup.[11]

#### A.

As stated, the thirty bottlers who remain in this case are now, or once were, engaged in bottling Coca–Cola under contracts which conform to the Consent Decrees issued in 1921. In amended Count One of their complaint, all thirty seek damages claiming the Company breached their contracts by unilaterally supplying them with HFCS sweetened syrup instead of sugar-sweetened syrup. During the course of the litigation, twelve of these bottlers either amended their bottling contracts as Coca–Cola requested or sold their rights to bottle Coca–Cola to bottlers who operate under amended bottling contracts. These twelve bottlers now seek only past damages under amended Count One and have no remaining claims under Count Two in which the remaining eighteen bottlers seek declaratory and injunctive relief requiring the Company to supply them with fructose-based syrup.

In Count One of their complaint, the bottlers had originally sought to enjoin the Company from providing it with HFCS-sweetened syrup and only alternately sought a "pass through" of the savings the Company realized by using HFCS in place of sugar. In 1986, faced with claims by some of the bottlers that this violated their contracts, the Company announced that it would henceforth supply the bottlers who refused the 1978 amendment with syrup sweetened with the cane or beet sugar which they claimed they had a right to.

Presented with the Company's new policy of providing sucrose-sweetened syrup, the bottlers reversed position and asked to amend their complaint to add a claim that they were entitled to HFCS syrup. *See Coke V*, 668 F.Supp. at 922 (allowing leave to allege "an additional breach of the Consent Decrees and Bottler's Contracts based on the Company's decision in March, 1987 to supply sucrose syrup to unamended bottlers"). In their original complaint, the bottlers had also included as Count Two a claim for restitution based on the benefit the Company realized from use of the cheaper HFCS syrup. The bottlers abandoned any claim to restitution as untenable and were allowed to substitute, as amended Count Two, their claim of contractual entitlement to HFCS-sweetened syrup. Because the bottlers no longer wanted sugar-sweetened syrup, they also amended Count One of their original complaint by eliminating its prayer for equitable relief and limiting themselves on that claim to damages for breach of contract in the form of a pass-through of the savings the Company realized by using the cheaper HFCS syrup. *Id.*

The bottlers apparent about face had a compelling business rationale. Over ninety-seven percent of all bottlers had accepted the 1978 amendment the Company proposed and now use an HFCS-sweetened syrup. *Id.* at 909; *see also Coke VII*, 769 F.Supp. at 646. Before the introduction of HFCS syrup, many of the bottlers had formed cooperatives in order to reduce the cost of bottling. After the Company's 1987 decision to supply the bottlers who had refused the 1978 amendment with sugar-sweetened syrup, it "notified the [cooperatives] ... that the Company's Beverage Quality Assurance Department would develop and forward procedures for segregating HFCS-sweetened syrup from sucrose-sweetened syrup." *Coke VII*, 769 F.Supp. at 644.[12] The bottlers who continued to

---

**11.** Again, for fuller details on the genesis of this litigation, the reader is referred to *Coke VII*, 769 F.Supp. at 604–606 and *Coke VI*, 696 F.Supp. at 68–71. This Part II of our opinion again draws from those opinions, at times verbatim.

**12.** These quality control procedures were directed at bottlers who would be packaging both HFCS-sweetened syrup and sucrose-sweetened syrup. These bottlers were required to:

(1) place orders for sucrose-sweetened syrup at least five days in advance; (2) thoroughly rinse the syrup storage system (hose, pumps, lines and tanks) before unloading sucrose-sweetened syrup into a tank which previously contained HFCS-sweetened syrup (no rinse is required, however when HFCS-sweetened syrup is placed into tanks formerly containing sucrose-sweetened syrup); (3) thoroughly rinse the system's syrup lines, proportioning,

resist the Company's proposal to supply HFCS syrup and received the sugar-sweetened syrup now incurred additional costs when they sought to have their syrup bottled by these cooperatives. Faced with the rising costs attendant to the Company's new quality control procedures, the bottlers asked and were granted leave to amend their complaint to include the present version of Count Two, claiming entitlement to HFCS-sweetened syrup.

### B.

As so amended, the bottlers' complaint continues to have four counts. Count One now seeks damages for breach of contract said to result from the Company's unilateral decision to supply the cheaper HFCS syrup to the bottlers who had refused amendment without a "pass through" of the savings that the Company realized when it substituted HFCS-sweetened syrup for sucrose-sweetened syrup in its sales to the bottlers. The bottlers argue that the Consent Decrees and their individual contracts with the Company entitle them to sugar-based syrup and that the damages suffered can be measured by the difference between the cost of sucrose-sweetened syrup and the cost of the cheaper HFCS syrup (the savings realized by the Company in light of the breach).

Only the eighteen bottlers who persist in their refusal to sign amended contracts are involved in Count Two. In it, they seek an injunction and declaratory relief that would require the Company to provide them with HFCS-sweetened syrup. They argue that under the Consent Decrees the Company promised to provide them with "standard syrup" and that the Company's subsequent course of conduct in introducing and expanding the use of HFCS-sweetened syrup has redefined the "standard syrup" as

HFCS syrup. Therefore, they contend that the Company must provide the same HFCS syrup that all the bottlers with amended contracts now receive, at cost plus a mark-up equivalent to mark-up above sucrose prices specified in the Consent Decrees and the individual contracts informed by those Consent Decrees.[13]

In Count Three, the bottlers claim that the Company erroneously calculated the market price on which the Consent Decrees required the Company to base its charges for the sugar-based syrup. The bottlers claim that market price means the lowest actual prices made known by sugar refiners to purchasers. The Company claims that market price means the generally higher "official list prices" issued by the sugar refiners.

Finally, in Count Four, the bottlers seek recovery of a portion of a $4,300,000.00 award the Company received under a settlement agreement it made with the major sugar refiners against whom it had claimed antitrust violations. The bottlers claim that they are injured parties entitled to share in that recovery with the Company.

### C.

In *Coke I*, the district court denied the bottlers' motion for class certification, holding that the commonality and typicality requirements of Federal Rule of Civil Procedure 23(a) were not satisfied because as many as thirty-two different states' laws could be involved and different courses of dealing peculiar to individual bottlers would have to be considered. *Coke I*, 95 F.R.D. at 175–79.

The district court also held that the plaintiffs lacked standing to enforce the Consent Decrees because the bottlers were not

---

cooling, carbonating, beverage lines and filler to remove all traces of HFCS–55 syrup when packaging sucrose-sweetened syrup after using the same equipment to package HFCS-sweetened syrup (but not vice versa); (4) keep finished products sweetened with HFCS and sucrose separate and designated by type; and (5) maintain records of syrup batch codes, date of product, shipping date, package date, code and *identity of recipient bottler.*

*Coke VII,* 769 F.Supp. at 644. The parties do not now directly question the Company's right to impose these restrictions.

**13.** Count Two, as amended, also included a punitive damages claim which the district court did not consider because of its disposition of amended Count Two.

parties to the Consent Decrees entered into between the parent bottlers and the Company. *Id.* at 175 (quoting *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 750, 95 S.Ct. 1917, 1932, 44 L.Ed.2d 539 (1975) (nonparties to consent decrees may not directly enforce those judgments "even though they were intended to be benefitted by [them]")).

The district court's second opinion, *Coke II*, arose out of an order granting reargument on some of the issues considered in *Coke I*. Following reargument, the district court reversed itself on the denial of class certification and vacated its holding denying the bottlers standing to enforce the Consent Decrees. With respect to class certification, the court concluded that because:

> the meaning of certain provisions of the Consent Decrees regarding the pricing and composition of Bottler's Syrup ... will affect all or a significant number of the putative class members, the plaintiff has satisfied the commonality requirement of Rule 23(a)(2).

*Coke II*, 98 F.R.D. at 265 (footnote omitted). It also reassessed the typicality question and decided that some, but not all, of the issues involved with the proposed representative's claims would be typical of those of the putative class members. *Id.* at 266–67. The district court then certified two issues as appropriate for class consideration: the meaning of the term "sugar" and the meaning of the term "market price" in the Consent Decrees. *Id.* at 268.

In *Coke II*, the court also withdrew its *Coke I* standing holding after concluding "the Court need not have decided these issues in that they were not necessary for a determination of the class certification motion then before the Court." *Id.* at 264. *Coke II* left the standing issues to "be addressed when and if a decision is necessary for the proper adjudication of this case." *Id.*

*Coke III* is of central importance to this appeal. In that opinion, after trial of the two certified class issues, the district court set forth its findings of fact and conclusions of law. On the first certified issue,

the court determined that the term "sugar" as used in the Consent Decrees meant "refined granulated sucrose from cane" and refined granulated sucrose from beets. *Coke III*, 654 F.Supp. at 1406. The court included cane sugar by virtue of the express language in the Consent Decrees and sugar made from beets based on the parties course of conduct, *i.e.,* the fact that the Company had, with the bottlers' knowledge, used beet sugar since 1941 without objection from the bottlers. *Id.* at 1403, 1406.

Finally, in *Coke III*, the district court recognized that one of the objectives of the Consent Decrees was to protect the bottlers' competitive posture. *Id.* at 1407–08. It then defined "market price" as follows:

> "Market price" as used in paragraph 7 of the Consent Decrees means an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale, but not including a standard two percent cash discount or any individually negotiated discounts, allowances or rebates.

*Id.* at 1418.

*Coke IV* dealt primarily with the bottlers' motion for summary judgment on the reopened issue of their standing to enforce the Consent Decrees; however, the district court also denied the Company's motion to amend the findings made in *Coke III* and the bottlers' motion to certify *Coke III* as final for appeal. *Coke IV*, 654 F.Supp. at 1429, 1448. Revisiting the issue whether any bottlers who had refused to amend their contracts could directly enforce the Consent Decrees as parties, the district court held that bottlers from the former Whitehead–Lupton territory who could trace their contractual rights to a member

of the intervenor class in *Coke 1920* had standing, but the bottlers whose contracts were derived from the Thomas Company lacked standing since the actual bottlers from the Thomas territory never intervened in *Coke 1920*. *Id.* at 1436–37. The district court, however, did not then determine which of the bottlers who remained as plaintiffs traced their rights to the Whitehead–Lupton Company. *See id.* at 1433–37, 1445.

*Coke V* followed the Company's announced decision to stop supplying HFCS-sweetened syrup to the bottlers who had refused to amend their contracts. In *Coke V*, the district court entered an order granting the bottlers leave to amend their complaint to seek an injunction against the Company's proposed return to cane or beet sugar. *Coke V*, 668 F.Supp. at 908.

As discussed *supra*, the factual theory behind the bottlers' demand for HFCS-sweetened syrup, instead of sugar-sweetened syrup, was that HFCS-sweetened syrup had become "standard Bottlers Coca–Cola Syrup." *Id.* at 915. Therefore, the Company's threatened action to limit them to sugar-sweetened syrup breached its implied duty of good faith. Although the district court granted the bottlers' motion to amend Count One of the complaint to limit relief to the savings pass-through and to file the supplemental pleading as new Count Two, it denied the bottlers' motion for a preliminary injunction against the return to a sucrose-based syrup because the bottlers had not shown a reasonable likelihood of success on the merits of their new claim that the Company had breached its implied duty of good faith. *Id.* at 921–23.

In *Coke VI*, the Company moved for summary judgment and the bottlers moved to intervene in the 1920 litigation between the Company and the parent bottlers in an effort to alter the Consent Decrees. *Coke VI*, 696 F.Supp. at 60. In addition, in *Coke VI*, the court disposed of the bottlers'

Count Four claim to a share in the proceeds of the antitrust settlement by dismissing it on the merits, following the parties' agreement that it could be decided on a paper record. *Id.* at 87, 90.

The district court first ruled that the Company owed no fiduciary duty to the bottlers. *Id.* at 75. Because no award of punitive damages may be sustained in the absence of a breach of fiduciary duty beyond the implied duty of good faith and fair dealing, this ruling disposed of the bottlers' Count Two prayer for punitive damages based on the Company's reversion to sucrose-based syrup to supply the needs of those bottlers still resisting amendment.[14] *Id.*

On the bottlers' prayer for injunctive relief against a return to sucrose-sweetened syrup, the district court denied summary judgment, rejecting the Company's argument that the bottlers were judicially estopped from making this claim. *Id.* at 80–82. It held that a disputed issue of material fact remained, namely "whether sugar, or more particularly, sucrose, is a defining characteristic of Coca–Cola Bottlers' Syrup under the contracts as of 1988 [the time of this litigation]." *Id.* at 81.

On the bottlers' Count One claim for damages, the district court denied the Company's motion for summary judgment because "a genuine and material issue of fact exists concerning whether the decrees' pricing scheme created an expectancy interest on the bottlers' part that the price of syrup would be linked to sweetener cost, no matter what sweetener was used." *Id.* at 77.

The district court also denied the Company's motion for summary judgment on Count Three, the market price claim, based on the affirmative defense of the applicable statutes of limitations. *Id.* at 87. On Count Four, the antitrust award claim, the district court decided in favor of the Company because the prior settlement did not

---

**14.** At a pre-trial conference in September of 1988, just over a month after the opinion in *Coke VI*, the district court modified its blanket denial of any fiduciary duty and ruled that a fiduciary duty claim could be pursued on the Company's disclosure of price information as

related to the bottlers' market price claim in Count Three of the Coke case. The parties disagree as to whether the district court also retreated on the fiduciary duty issue as it applied to the claim for injunctive relief in Count Two.

determine that the sugar producers actually fixed prices and because the Company's recovery was based on the actual cost of its purchases from the sugar producers while the term "market price" in the Consent Decrees, as defined in *Coke III*, did not mean the Company's actual cost of purchase. Thus, the money that the Company recovered was an increase in the price of sugar that it absorbed and not one that it passed on to the bottlers. *See id.* at 89–90.

Finally, in *Coke VI*, the district court held that none of the bottlers who were still active in the litigation had standing to enforce the Consent Decrees because none of them could trace their contractual rights directly to the Whitehead–Lupton Company. It then denied the bottlers' motion to intervene in the "1920 litigation." *Id.* at 90–91, 96.

*Coke VI* set the stage for the seventh and final district court opinion in the case. Only Counts One through Three remained for decision. By then, a new district court judge had taken over responsibility for the case because the judge who had authored the first six opinions and conducted a trial on the outstanding issues had been prevented from rendering a final decision by illness. *See Coke VII*, 769 F.Supp. at 604.

In *Coke VII*, after a retrial of the outstanding issues, the district court decided in favor of the bottlers on their Count One claim for damages. It held that the bottlers were entitled to syrup sweetened with sugar, that the price of the syrup was tied to the price of the sweetener and that the bottlers who had refused to accept the Company's proposed amendment were entitled "to the savings resulting from the use of the cheaper HFCS in place of sugar." *Id.* at 629–30. The district court also awarded the bottlers prejudgment interest but denied them attorney's fees under Count One. *Id.* at 633–34.

Under Count Two, the court denied the eighteen bottlers who were still operating under the unamended 1921 contracts injunctive relief that would have required the Company to supply them with the now commonly used HFCS-sweetened syrup instead of the sucrose-sweetened syrup. *Id.*

at 648–50. In deciding against the bottlers on Count Two, the court concluded that the Consent Decrees and the contracts entered into under them did not entitle the bottlers to receive anything except a syrup sweetened with 5.32 pounds per gallon of sucrose refined from sugar cane or sugar beets. *Id.* at 653.

On Count Three, the district court applied the definition of market price set forth in *Coke III* and held that "the Company's reliance on list price to calculate the syrup price does not constitute a breach of the pricing provisions of the unamended contracts, and plaintiffs, therefore, are not entitled to damages." *Id.* at 670.

### III.

We have appellate jurisdiction over the final judgment of the district court in *Coke VII* under 28 U.S.C.A. § 1291 (West Supp. 1992). The district court had subject-matter jurisdiction pursuant to 28 U.S.C.A. § 1332(a)(1) (West Supp.1992).

█ Whether the bottlers' contracts and the Consent Decrees are ambiguous is subject to plenary review. *See Clement v. Consolidated Rail Corp.*, 963 F.2d 599, 600 (3d Cir.1992); *Washington Hosp. Inc. v. White*, 889 F.2d 1294, 1299–1300 (3d Cir. 1989). The intent of the parties to ambiguous provisions in a contract is, however, a question of fact that an appellate court can set aside only if it is clearly erroneous. *Painewebber, Inc. v. Hartmann*, 921 F.2d 507, 510 (3d Cir.1990).

### IV.

The bottlers raise three issues that cut across all counts: whether they had standing to enforce the Consent Decrees, whether they could intervene in or reopen the *Coke 1920* litigation that led to the Consent Decrees, and whether the district court erred in granting summary judgment to the Company on the bottlers' fiduciary duty claims. We hold that each of those arguments lacks merit and we reject them without further discussion essentially for the reasons set forth by the district court in its opinions in *Coke IV* and *Coke VI.*

*See Coke IV,* 654 F.Supp. at 1429–45; *Coke VI,* 696 F.Supp. at 71–75, 90–96.

We will address the parties' other contentions on a count-by-count basis starting, however, with Count Two.

### A.

■ The district court rejected the bottlers' claim that they had a right to a syrup made with HFCS and denied the continuing bottlers injunctive relief compelling the Company to provide them with syrup made with HFCS.

The district court's conclusion that the bottlers' contracts, as informed by the Consent Decrees, do not require the Company to provide the bottlers with an HFCS-sweetened syrup involves the interpretation of ambiguous terms in the contract, which we review deferentially under the clearly erroneous standard. *See Washington Hosp.,* 889 F.2d at 1299–1300.

The eighteen bottlers who have not agreed to amend their contracts argue that they are entitled to a "standard syrup" under Paragraph Ten of the Consent Decrees and define "standard syrup" as the syrup commonly provided to the Company's bottlers. Because ninety-seven percent of Coca–Cola bottlers now receive HFCS, these eighteen bottlers maintain that HFCS syrup has replaced syrup sweetened with cane or beet sugar as the "standard syrup." They rely on extracts from the depositions of key Company executives stating that HFCS syrup is a type of syrup covered by the bottlers' contracts. For example, the following deposition testimony of Brian Dyson, President of Coca–Cola U.S.A., was admitted into evidence at trial:

QUESTION: It is true, is it not, that since November of 1984, Coca–Cola bottlers' syrup manufactured by the Coca–Cola Company and supplied to the bottlers in the United States has not contained any sucrose?

ANSWER: I can't remember the exact date, ... let's take it within the last two or three months, that is absolutely true.

QUESTION: And the Coca–Cola bottlers' syrup being manufactured on April 22 under what the Company has called the old formula contained only HFCS–55 as its sole sweetener?

ANSWER: Yes.

QUESTION: And the Coca–Cola bottlers' syrup manufactured today contains no sucrose?

ANSWER: Yes.

QUESTION: And the Coca–Cola bottlers' syrup today manufactured under the new formula with the new taste contains only HFCS–55 as its sole sweetener?

ANSWER: Yes.

App. at 2119–20. The bottlers point out that the Company stated in its responses to the bottlers' interrogatories that "Coca–Cola Bottle Syrup containing HFCS–55 meets all requirements of the Bottle Contract for Coca–Cola." *Id.* at 4711. They also argue that the district court's reason for denial of relief on their amended Count Two violates the portions of the Consent Decrees that were found in *Coke III* to be "bottler protective" by guaranteeing them a syrup containing 5.32 pounds of sugar derived from beets or cane at the prevailing market price of such sugar plus a mark-up fixed in terms of dollars and cents. The bottlers argue that their contracts did not merely obligate the Company to provide them with a sugar-based syrup, but rather conveyed to them a property right in the form of a perpetual franchise in the business of bottling and marketing Coca–Cola in all its natural varieties. They contend that the introduction of HFCS syrup requires their contracts to either be interpreted or reformed in a manner that will assure them a supply of HFCS-sweetened syrup because its development was wholly unforeseen in 1921. They rely on Paragraph Ten of the Consent Decrees which

states that the syrup provided to the parent bottlers by the Company would be "high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty-two one-hundredths (5.32 pounds) of sugar to each gallon of syrup." Paragraph 10 contains the only description of syrup for bottling pur-

poses in either the Consent Decrees or the bottl[ing] contracts.

*Coke VII,* 769 F.Supp. at 639 (quoting Consent Decrees).[15] Under the bottlers' asserted interpretation of the Consent Decrees, they are entitled to *all* syrups that may be characterized as standard Coca–Cola bottling syrup. The Consent Decrees, the bottlers maintain, were never designed to limit the scope of their entitlement. To the extent that the Consent Decrees reference a certain composition of the syrup, this only sets a quality baseline below which the syrup may not fall.

In *Coke III* the district court found:

I conclude the parties to the settlement agreements that became the Consent Decrees intended the term "sugar" in paragraph 10 to mean refined granulated sucrose from cane. The use of sugar from beets violated the Consent Decrees, but the bottlers waived objection to that violation. Thus, the effective present meaning of the term "sugar" in paragraph 10 is refined granulated sucrose from cane or beet, *a definition that excludes HFCS–55.*[16]

*Coke III,* 654 F.Supp. at 1406 (emphasis added) (footnote added). In *Coke VII,* the district court relied on this finding and rejected the bottlers' proposed interpretation, deciding that the bottlers could not compel the Company to provide them with HFCS-sweetened syrup. First, the district court held that "standard" refers to the quality of the syrup, which the bottlers do not contend has been altered, and not to differences in the particular ingredients used in supplying syrup to different bottlers. *Coke VII,* 769 F.Supp. at 640. The district court next concluded that:

In supplying plaintiffs with sucrose-sweetened syrup, the Company was not only acting within its contractual rights, it was in fact performing an express obligation of plaintiffs' unamended contracts. This is not a situation in which the Company did something that the contracts *permitted;* rather, the Company was obligated by the express terms of the contracts to supply plaintiffs with syrup containing 5.32 pounds of sugar.

*Id.* at 652 (emphasis in original). The district court's unchallenged findings of fact support this conclusion. For example, after restating the parties' attempts to find substitute sweeteners in the early twentieth century, the district court found that:

The parties' familiarity with substitute sweeteners in 1921 and their dissatisfaction with the effect of substitute sweeteners on the quality of the syrup, combined with their failure to provide for the use of sweeteners other than sugar in the Consent Decrees and unamended bottle contracts, *is evidence that the parties intended that 5.32 pounds of sugar be used as the exclusive sweetener for Bottlers Coca–Cola Syrup.*

*Id.* at 642 (emphasis added).

Without disputing any of the findings of fact that support the district court's conclusions, the bottlers argued that the court's earlier rulings on the distinguishing characteristics of Bottlers' Coca–Cola Syrup are not inconsistent with their claims of right to HFCS syrup. The court responded in *Coke VI* that:

The Court's previous statements on the question of the meaning of sugar under the contracts and decrees are by no means fatal to the plaintiffs' argument that Coca–Cola Bottlers' Syrup may be, and in light of the Company's utilization of HFCS must be, defined separately from whatever ingredient is used to sweeten it. Albeit supported by this Court's prior statements, the Company's position extends further to the assertion that the sweetener used defines whether a product falls within the scope of the term Coca–Cola Bottlers' Syrup. The Court's previous rulings have not swept this far. Instead, they have centered on

---

**15.** It is unclear whether the bottlers continue to press their claims for concentrate instead of syrup. If they do, then we reject those claims for the reasons set forth by the district court. *See Coke VII,* 769 F.Supp. at 646–47, 654.

**16.** In light of this finding, we see no merit in the argument that the second district judge in *Coke VII* violated the principle of the law of the case in deciding Count Two.

the meaning of terms used in the decrees, and have not fully explored the plaintiffs' rights under their contracts....

*Coke VI,* 696 F.Supp. at 81.

The bottlers' argument is self-defeating. The failure of the pre-*Coke VII* rulings to "swe[ep] th[at] far," *id.,* cannot preclude the district court in *Coke VII* from finally resolving after trial the fact issue of what meaning the parties intended to give the ambiguous phrase "standard syrup" in their individual contracts as informed by the Consent Decrees. It was precisely this question, the definition of "syrup," that the district court in *Coke VI* reserved for decision because it depended on a genuine dispute about a material issue of fact. *See supra* at 400.

The facts found by the district court fully support its dismissal of Count Two in *Coke VII.* None of them are clearly erroneous. Its conclusion flows logically from its findings. A reading of the Consent Decrees amply supports the conclusion that one gallon of Coca–Cola bottling syrup as contemplated by the parties must contain the stipulated ingredients, 5.32 pounds of cane (or beet) sugar. Even if the bottlers' interpretation of the contract was plausible, it is not of sufficient force to render the district court's determination of the contracting parties' intent clearly erroneous. None of the previous rulings of the district court preclude its finding on the meaning of syrup or its conclusion, based on its interpretation of the ambiguous terms "sugar" and "syrup" in the bottlers' contracts and the Consent Decrees, that the bottlers were not entitled to HFCS-sweetened syrup.

 Alternately, the bottlers contend that if the contracts and the Consent Decrees are not interpreted to include HFCS-sweetened syrup, they should be reformed because the technological advances that now permit the use of HFCS, as opposed to

the corn sugar or corn syrup that was tried and found wanting around the time of World War I, was unforeseen when the Consent Decrees were entered in 1921. The bottlers have not made a case for reformation. Reformation is available when clear and convincing evidence shows the parties had a shared intent to contract on a subject different from the subject they mistakenly memorialized in recording their agreement, or where their mutual mistake resulted in a written document which does not accurately reflect the terms of the parties' agreement. *See* Restatement (Second) of Contracts § 155 (1981). Contracting parties cannot share an intent about something they entirely failed to foresee.[17] The bottlers have not produced any clear and convincing evidence that the parent bottlers mutually shared with the Company an intention to provide the actual bottlers with the economic benefit of the technological advances that made possible a syrup produced with sweeteners other than sugar, in this case HFCS, comparable in quality to syrup sweetened with cane or beet sugar. Though the bottlers rely heavily on language from *Coke III,* they do not cite the following passage from that opinion:

Now that a fully acceptable substitute has been developed, and is being used in competing brands, it is in the interest of both the Company and the bottlers to use that substitute in place of sugar. The effect of paragraph 10's sugar requirement is to require the Company to secure the consent of the bottlers before that change is made. It is the task of the parties, not of this Court, to refashion the agreement to reflect new developments. *See [Coke 1920],* 269 Fed. at 805.

*Coke III,* 654 F.Supp. at 1403. We agree.

As the district court recognized, the bottlers' argument sweeps too far. The Restatement provides:

---

17. The statement by the district court in *Coke VII* that "[a]t most, plaintiffs have shown only that technology may have rendered portions of the unamended contracts obsolete," *Coke VII,* 769 F.Supp. at 650, is consistent with this conclusion. While the availability of satisfactory

sweeteners might make a "sugar only" contract an oddity today, sugar as a sweetener is not obsolete. Indeed, the bottlers have remained profitable despite their use of the sugar-based syrup. *See id.* at 605.

Where a writing that evidences or embodies an agreement in whole or in part fails to express the agreement because of a mistake of both parties as to the contents or effect of the writing, the court may at the request of a party reform the writing to express the agreement, except to the extent that rights of third parties such as good faith purchasers for value will be unfairly affected.

Restatement (Second) of Contracts § 155. We think the statement must be more narrowly read than the bottlers wish. Thus, an example of the kind of mistake for which reformation would be available is a case in which clear evidence shows that the parent bottlers and the Company had wanted 5.*23* pounds of sugar per gallon of syrup but the contracts they entered into mistakenly required the syrup to contain 5.*32* pounds of sugar per gallon of syrup. *See id.* §§ 155, 166.

There is no proof in the record that the parties made this kind of a mistake in reducing their agreements to writing and incorporating them into the Consent Decrees. The district court's finding that alternative sweeteners had been tried during World War I and were found to be unsatisfactory is not contested. *See Coke VII,* 769 F.Supp. at 641. The contracting parties, instead of leaving room in the Consent Decrees for unforeseen sweeteners that future research and development might reveal, specified to the one-hundredth of a pound the minimum amount of sucrose that would meet the contract's terms. The fact that the parties failed in 1921 to anticipate and provide for the development of satisfactory sweeteners, other than sucrose, does not mean that they made a mutual mistake in reducing their shared intent to writing when they specified the sweetener for Coca–Cola Bottlers' Syrup would be 5.32 pounds sucrose per gallon. The fact that they based the price of the syrup on the market price of sucrose with a mark-up in absolute terms, instead of a percentage mark-up, is evidence to the contrary.

The natural inference from the specificity of the Consent Decrees is, as the district court found, that the parties intended any change in sweetener to be left to future

amendment or new agreement. Had the parties intended the Consent Decrees to cover the "unforeseen" development of other acceptable sweeteners, they should have fashioned a looser definition of "syrup." The bottlers would have us reform their agreement to read 5.32 pounds of sugar per gallon of syrup or the equivalent in sweetening power of any natural sweetener approved by the bottlers despite a lack of any clear evidentiary support that the parties so intended. We decline.

■ Moreover, the Consent Decrees' definition of the price of syrup in terms of the market price of a precise amount of sucrose refined from cane sugar would have left it up to the district court to decide what price would be "reasonable" for the new HFCS sweetener. The parties must have intended to conclude a contract for the sale of the goods that use HFCS before a court will imply a reasonable price for them. *See* U.C.C. § 2–305. As the district court has already found, there was no such intent at the time the 1899 agreement or the 1921 Consent Decrees were executed. In any event, even if there were an intent to include HFCS within the scope of the contracts, the evidence the bottlers produced is insufficient for that determination. Although the Uniform Commercial Code has relaxed the common law rule that an agreement to furnish a product which fails to set a price for that product is not a contract that is definite enough to be enforced, that relaxation does not leave a court free to provide a price for the sale of goods the parties have not mentioned in the absence of evidence from which a reasonable price could be inferred. *See id.; see also Big Farmer, Inc. v. Agridata Resources, Inc.,* 221 Ill.App.3d 244, 163 Ill. Dec. 629, 632, 581 N.E.2d 783, 786 (1991); *Pulprint, Inc. v. Louisiana–Pacific Corp.,* 124 Misc.2d 728, 477 N.Y.S.2d 540, 542 (1984).

The bottlers' argument that the price for HFCS syrup, or indeed any syrup using a sweetener other than sucrose, can be mechanically determined by applying a mark-up above the cost of other sweeteners that

is proportionate to the 1921 agreement's mark-up above the market price of refined granulated cane or beet sugar is unavailing. The 1921 agreement does not set any percentage mark-up for Coca–Cola syrup. It sets only a fixed amount in absolute monetary terms which is to be added to the market price of cane or beet sugar. There is no evidence to show what other costs or savings are involved in producing or developing Coca–Cola syrup using other sweeteners. The record does not show what research and development costs the Company incurred in developing HFCS or whether any research and development costs should be included in the price of the newly developed HFCS variety of Coca–Cola bottling syrup. There is likewise nothing in this record that would enable us to determine whether the price of Coca–Cola bottling syrup using HFCS or other new and unforseen sweeteners should be dependent on the market price of those other sweeteners or on the market price of the sugar the parties were familiar with when they made their agreement defining the price of syrup in terms of the price of 5.32 pounds of cane sugar per gallon. We therefore refuse the bottlers' invitation to set a price for syrup sweetened with ingredients other than sucrose. Again, this task is best left to the parties to the agreement, not a court.

We will, therefore, affirm the district court's final judgment in favor of the Company on Count Two.

### B.

■ On Count One, the district court held that the Company had breached the 1921 bottling contracts when it unilaterally substituted the cheaper HFCS-sweetened syrup for sucrose and that the bottlers suffered contractual damages as a result of that breach. It measured those damages by the savings the Company realized when it substituted the cheaper HFCS sweetened syrup for the more costly sucrose-sweetened syrup that Paragraph Ten of the Consent Decrees required it to supply. *See Coke VII,* 769 F.Supp. at 629. The district court assessed the damages in favor of the bottlers by

> subtracting the list price of HFCS–55 from the list price of sugar in each relevant quarter and multiplying by the number of gallons of syrup purchased by each plaintiff, adjusting for the actual percentage of HFCS–55 (25%, 50%, 75% or 100%) used in the syrup each quarter.

*Id.* at 630.[18] The district court also awarded the bottlers prejudgment interest. *Id.* at 633. These awards totalled $20,742,-398.20 and are the subject of the Company's cross-appeal.

The parties raise three issues concerning the district court's disposition of Count One. The Company contends that the district court erred in awarding the bottlers anything more than nominal damages even if it did breach the contract by providing HFCS syrup instead of syrup sweetened with cane or beet sugar because that breach did not in any way affect the quality of the syrup or the sales of the bottlers. Hence, the Company argues that the economic benefits the bottlers had a right to expect from their bargains were unaffected and they suffered no damages recoverable in contract beyond nominal damages. Second, the Company argues that even if the award itself could stand, prejudgment interest should not have been given to the twenty-three bottlers who dominate the market for bottled Coca–Cola in the twelve jurisdictions[19] that allow awards of prejudgment interest only for liquidated damages. The bottlers reject these contentions and argue additionally that the district court imposed on them too strict a burden of proof on damages and therefore denied them full compensation for the Company's breach.

---

**18.** The various percentages of HFCS used are mentioned because at times the Company used a mixture of HFCS and sugar to make Coke syrup. *See supra* at 396.

**19.** The twelve jurisdictions are: Arizona, Arkansas, Illinois, Minnesota, Missouri, North Car-olina, North Dakota, Ohio, Oklahoma, Pennsylvania, Texas, and Wisconsin. For the twenty-three unamended bottlers located in these jurisdictions, *see supra* n. 3.

In order to show a breach by the Company, the bottlers rely on a "linkage" that the district court found between the quality and price requirements of the bottling contracts. This "linkage," they say, arises from coupling the statement in Paragraph Ten of the Consent Decrees that "high grade standard" syrup contains 5.32 pounds of "sugar" with the provisions in the decrees' Paragraphs Five and Six that every one cent per pound increase in the price of sugar will increase the price of syrup by six cents per gallon.[20]

The bottlers contend that the text of these three paragraphs ties together the syrup's quality and price for the purpose of preventing the Company from escaping its obligation to provide a sugar-based syrup at a sugar-based price and this precludes the Company from substituting a comparable non-sugar-based syrup without changing the price. In support, the bottlers refer to the following portion of the district court's *Coke III* opinion, which was followed in *Coke VII* in awarding the bottlers damages on Count One:

> The express competitive-pricing rationale recited in paragraph 6 for tying the price of syrup to the price of sugar at a six-to-one ratio is undermined if the Company can use a cheaper sweetener but continue to employ the paragraph 6 pricing mechanism. The requirement of 5.32 pounds of sugar in paragraph 10 ensures the Company cannot evade the pricing provisions of paragraphs 5, 6, and 7, and increase the effective syrup price to the bottlers, by reducing the amount of sugar to less than 5.32 pounds or by using cheaper substitutes.
>
> Defendant argues that so long as the strength of the syrup is maintained, (i.e., the cheaper sweetener is not an inferior sweetener), bottlers are not cheated of their bargain if the Company uses a cheaper sweetener.
>
> The short answer to defendant's argument, and the fact to which the Court must return, is that the 1921 Consent

Decrees were premised on the use of granulated cane sugar as a sweetener. In light of the experience of the parties prior to the entry of the Decrees, as well as the strong bargaining position enjoyed by the bottlers after the decision of this Court and argument before the Court of Appeals, the Court finds it unlikely they would enter into an agreement that allowed the Company to exploit a cheaper sugar in the manufacture of Coca–Cola Bottlers Syrup but keep the price of that syrup tied to the price of granulated sugar.

*Coke III*, 654 F.Supp. at 1401–03.

Essentially the bottlers contend that the effect of the Consent Decrees is to entitle them to syrup dependent on the price to the Company of whatever sweetener it chooses to use. They say that the Company is required to pass-through to the bottlers, as an intended benefit of the bargain, any savings that result from a substitution of sweeteners. Accordingly, the bottlers reject the Company's contention that they suffered no loss of expectancy as a result of the Company's substitution of the cheaper HFCS sweetener for the more expensive sugar-based syrup it promised.

If the bottlers are not entitled to any compensatory damages, there is no need to reach either the issue of the sufficiency of the principal amount of the award or the availability of prejudgment interest. Therefore, we will first consider the bottlers' right to compensatory damages.

Resolution of this issue requires application of some basic principles of the common law of contracts to the facts of this case. Therefore, we exercise plenary review over the district court's conclusion that the bottlers are entitled to compensatory damages measured by the benefit the Company received from using HFCS syrup. On this issue, the Company contends that the district court's award of compensatory damages put the bottlers who refused to amend their contracts in a better position than

**20.** This constant ratio of six cents per gallon of syrup for every one cent increase in the price of a pound of sugar exactly mirrors the cost increase attributable to 5.32 pounds of sugar the decrees require the Company to use in each gallon of standard bottlers' syrup, rounded up to the next whole number.

they would have been had no breach occurred. It says in its brief:

It is undisputed that syrup sweetened with HFCS is indistinguishable from syrup sweetened with sucrose. The only difference is that it costs the Company less to manufacture. At trial the bottlers readily conceded that in terms of sales, operations, expenses, income, and customer satisfaction, they were in exactly the same position during 1980–87 as if the Company had supplied sucrose-sweetened syrup throughout. Their economic position changed not one whit, regardless of whether sucrose or HFCS was used as a sweetener.

Brief for Cross–Appellant at 19–20 (citations omitted). Because it never charged anything more than the price of the sugar-based sweetener, the Company contends that the bottlers have not suffered any loss of expectancy that would entitle them to damages in contract. Thus, the Company continues, recovery here can only be justified on a theory of restitution or unjust enrichment, but the bottlers, in the course of the proceedings in the district court, withdrew and abandoned the restitution claim they had made in their original complaint. *Coke V*, 668 F.Supp. at 922; *see also supra* at 397. Therefore, the Company says that no unjust enrichment award is possible under Count One because the bottlers' only remaining theory of recovery is contract.

In awarding damages to the bottlers, the district court ultimately found that the "linkage" between the agreement's quality and price provisions did make the price of standard bottling syrup dependent upon the type of sweetener used. It based its conclusion that the bottlers are entitled to compensatory damages for breach of contract largely on its sixty-ninth factual finding. That finding states:

Because both the base price and the escalator provisions were premised on the market price of the amount of sweetener then in use, the Court finds it highly

unlikely that the parties could have intended the application of a sugar-based pricing formula to a syrup that did not contain sugar. The Court now turns to the question of which party was intended to benefit from a decrease in the price of the sweetener. . . .

*Coke VII*, 769 F.Supp. at 625–26.

To the extent that Finding No. 69 implies the parties did not intend to use a sugar-based pricing formula for a syrup that does not contain sugar, it is correct. The contract is silent on the use of cheaper substitutes like HFCS in place of sugar.[21] It simply makes no provision regarding either their use or the effect of their use on the price of syrup. Implicit in Finding No. 69 is a finding that the court had not been persuaded that the Company and the parent bottlers, when they entered into the 1921 Consent Decrees, contemplated use of any syrup other than one sweetened with cane or beet sugar. As the district court found in *Coke III*, "the 1921 Consent Decrees were premised on the use of granulated cane sugar as a sweetener." *Coke III*, 654 F.Supp. at 1402.

To the extent, however, that Finding No. 69 implies that the Consent Decrees permit the Company to use a syrup sweetened with anything other than sugar, it cannot stand because it conflicts with the earlier finding in *Coke III* that "the effective present meaning of the term 'sugar' in paragraph 10 is refined granulated sucrose from cane or beet, a definition that excludes HFCS–55." *Id.* at 1406; *see also Hayman Cash Register Co. v. Sarokin*, 669 F.2d 162, 168–69 (3d Cir.1982) (judges of co-ordinate jurisdiction may not reverse ruling by different judge in same case except in extraordinary circumstances).

The definition of sugar was not an open question when the district court issued its opinion in *Coke VII*. What the parties to the Consent Decrees intended the term "sugar" to mean was decided in *Coke III* when the district court found that "sugar"

---

**21.** As discussed *supra*, both the Company and the bottlers in 1921 were well aware of other sweeteners. The specific definition of the sucrose content, as well as the absence of provi-sions for other substitutes, lead to the conclusion that the Consent Decrees covered nothing but syrup sweetened with 5.32 pounds of sugar.

meant "sucrose." The only fact that remained in dispute after *Coke IV* was whether the phrase "standard Coca–Cola bottling syrup" included syrups using "sweeteners" other than sucrose. That question was resolved in *Coke VII* when the district court decided "standard bottling syrup" was limited to syrup sweetened with sucrose. The requirement in Paragraph Ten that 5.32 pounds of sugar be used in each gallon of syrup assures the bottlers that they are receiving "high grade standard" syrup. Under the terms of the contract, the Company cannot reduce the amount of sucrose per gallon of syrup below the specified 5.32 pounds. To do so would constitute a breach of contract because the bottlers would not receive a syrup containing 5.32 pounds of sugar, to which they are unquestionably entitled. Accordingly, by unilaterally substituting HFCS for a cane or beet-based sweetener, the Company breached its agreements with the bottlers.

In order to recover anything beyond nominal damages for the Company's breach, the bottlers must show, however, that they suffered a loss of the economic expectancy or benefit they hoped to obtain from their bargains with the Company because of the Company's breach. This requirement is somewhat loosely stated in the general proposition that a breach of contract without pecuniary harm entitles the non-breaching party to no more than nominal damages. *See* Restatement (Second) of Contracts § 346(2) (1981) ("If the breach caused no loss ... a small sum fixed without regard to the amount of loss will be awarded as nominal damages.").[22] It is an "assumption of contract law that the principal purpose of the rules relating to breach is to place the injured party in as good a position as he would have been had the contract been performed." *Id.* Chapter

16 (§§ 344–385) introductory reporter's note. Under this principle, damages in contract are generally measured by the loss of economic expectancy the non-breaching party suffers as a result of the failure of performance plus any so-called incidental or consequential losses, minus any expenses saved. *Id.* § 347. In unusual cases where it is plain that the non-breaching party has suffered some loss of benefit or expectancy but the monetary value of that loss of expectancy is not susceptible to measurement, courts sometimes resort to a restitution measure of damages; but damages measured by the monetary value of the benefit unjustly reaped by the breaching party are permitted on a contract theory only if a loss of expectancy has been established that is otherwise unquantifiable in pecuniary terms. *See id.* Here, it is uncontested that the HFCS-sweetened syrup is of the same quality as the promised sucrose-based syrup. It is equally acceptable to the consumers of Coca–Cola to whom the bottlers sell, and the bottlers have suffered no loss of sales as a result.[23] The bottlers lost no expectancy by virtue of the substitution. Absent such a loss, no damages are recoverable in contract. The district court's award measured by the benefit to the breaching party is based in restitution and cannot stand in the face of the bottlers' abandonment of that theory. Since the bottlers have suffered no loss of expectancy or bargained for economic benefit, only nominal damages can be awarded on the contract.

The district court's Finding No. 67 in *Coke VII* strengthens our conclusion that the use of HFCS-based syrup and its price are beyond the scope of the Consent Decrees and the contracts the bottlers made with the Company based on those decrees. In Finding No. 67, the district court stated:

**22.** The parties, in large part, have not briefed the issues in this case by citing to contract cases in the various states whose laws might be applicable. We take this as an implied concession that the law in the relevant states is similar and accords with general principles of contract law, hence our reliance on the Restatement and consistent cases instead of an independent investi-

gation of the law of each of the seventeen states, *see supra* n. 3, that might apply to this appeal.

**23.** The bottlers do not argue, nor have they presented evidence to indicate, any inferiority of the HFCS-sweetened product. In fact, the bottlers' attempt in Count Two to compel the supply of HFCS syrup is strong evidence of its suitability as a sweetener for Coca–Cola.

Paragraph 10 of the Consent Decrees is both a quality-control and a price-protecting provision. The requirement of "high grade standard Bottlers Coca–Cola Syrup" and the requirement of at least 5.32 pounds of sugar per gallon address the quality of the syrup. The requirement that the syrup contain not less than 5.32 pounds of sugar per gallon addresses price as well as quality by ensuring the Company cannot reduce the amount of sugar in the syrup or use a cheaper sweetener to evade the pricing provisions of paragraphs 5, 6 and 7 of the Consent Decrees.

*Coke VII*, 769 F.Supp. at 625. The price of the syrup is dependent on the type of sweetener used in the syrup, but, as the district court found, the Consent Decrees specify only one type of sweetener-sucrose. The price provision in the Consent Decrees and the bottlers' contracts is linked entirely to the amount of sucrose used, not to any other type of sweetener. Were we to conclude that the contract includes any substitute sweetener, the syrup containing such substitute would be without a price because the parties never agreed on one. As we explained in our analysis of the issues raised by the district court's denial of the bottlers' Count Two claim of entitlement to HFCS syrup, a court cannot supply a price if the parties have not agreed on one or at least presented evidence from which the court could infer a reasonable price. *See supra* at 404–406. Under the terms of the contracts which obligate the Company to provide Coca–Cola syrup to the bottlers, they are entitled only to sucrose-based syrup and only with respect to sucrose-based syrup have their minds met as to price. The entire history of this dispute and the precision with which the Consent Decrees defined the quality and the price of the syrup product that was the subject of the bargain on which the bottlers' rights are based negates any intent to permit a court to set a reasonable price. U.C.C. § 2–318

is only a presumptive rule that allows a court to set a reasonable price where it can determine the commodity to be priced was a commodity the parties agreed to buy and sell. The text of the Consent Decrees negates the use of the Uniform Commercial Code presumption.

Our conclusion is not inconsistent with the district court's determination that Paragraph Ten is a "quality control" provision. While we agree that the unilateral actions of the Company breached the quality control aspect of its bargain, it is incumbent upon the bottlers to demonstrate loss resulting from the change in sweeteners. Under an expectancy theory, compensation follows a loss of expected benefit. The Consent Decrees entitled the bottlers to a syrup that, *inter alia*, smelled, tasted, looked and sold like syrup sweetened with 5.32 pounds of sugar. The HFCS syrup met these qualifications. Absent a decrease in quality, the bottlers have suffered no loss of expectancy. Accordingly, the judgment of the district court on Count One must be modified to eliminate its award of expectancy damages to the bottlers and to substitute therefor nominal damages of $1.00.[24]

C.

In Count Three, the bottlers claim that the Company consistently overcharged them for the sugar used in Coca–Cola Bottlers' Syrup. In *Coke VII*, the district court held for the Company on Count Three because the bottlers did not prove that the market price of sugar was other than the list price used by the Company. The district court concluded that "the Company's reliance on list prices to calculate the syrup price does not constitute a breach of the pricing provisions of the unamended contracts, and plaintiffs, therefore, are not entitled to damages." *Coke VII*, 769 F.Supp. at 670. The bottlers again refer to the doctrine of "the law of the case" to attack this holding. They argue that the

**24.** This modification of the district court's award to the bottlers on Count One makes it unnecessary to reach the Company's contention that the district court erred in awarding prejudgment interest to bottlers from certain states.

It is likewise unnecessary to discuss whether the district court held the bottlers to an excessively strict burden of proof as to damages on Count One.

district court disregarded the earlier conclusion in *Coke III* that market price is the price to the Company, not the published list price. We review this issue for abuse of discretion. *See Schultz v. Onan Corp.*, 737 F.2d 339, 345 (3d Cir.1984).[25] To the extent that the bottlers attack the district court's factual findings, however, we reverse only if its findings were clearly erroneous. *See* Fed.R.Civ.P. 52(a).

The bottlers contend that "Judge Farnan undermined the meaning of Judge Schwartz's ultimate conclusion that 'market price' is the price at which sugar 'is principally *sold* to industrial users.'" Brief for Appellants/Cross–Appellees in No. 91–3496 at 24 (citing *Coke III*, 654 F.Supp. at 1418) (emphasis added). They argue the district court's "equation of market price with the published list price was a dramatic *reversal* of the *Coke III* ruling." *Id.* (emphasis in original) (citations omitted). More specifically, the bottlers argue that the district court in *Coke VII* rejected a mass of testimonial and documentary evidence that Judge Schwartz had accepted, and that Judge Farnan, in *Coke VII*, completely disregarded the earlier finding in *Coke III* on the meaning of "market price." In *Coke III*, the district court found that the Hodgson Memorandum "set[ ] forth the policy of The Coca–Cola Company with respect to market price." *Coke III*, 654 F.Supp. at 1418. The Hodgson Memorandum stated in pertinent part:

> [A]t times a refinery will sell below its own list price and that quoted by Willett & Gray [a recognized standard statistical

service on sugar]. Under such circumstances the Purchasing Department has been using the lower price.... [W]here there was a possibility of two interpretations ... the Thomas Company and the Bottler had in every instance benefited.

*Id.* at 1416 (quoting Hodgson Memorandum). In Finding No. 82 in *Coke VII*, the second district judge wrote:

> The Court finds that the Hodgson Memorandum does not support plaintiffs' assertion that the Company prior to 1969 conducted its own independent investigation into the price of sugar for the first seven days of each quarter.

*Coke VII*, 769 F.Supp. at 668. The bottlers argue these findings demonstrate that the district court's treatment of the Hodgson Memorandum in *Coke III* is inconsistent with its conclusion in *Coke VII* that the Company's reliance on list prices was not a breach of the provisions in the bottlers' contracts that made the price of syrup dependent on the market price at which the Company was able to buy sugar.

The Company's response is that the district court's definition of market price in *Coke III* merely set the framework for the bottlers' proof. In other words, though *Coke III* defined the term "market price" it left it up to the bottlers to produce evidence sufficient to persuade the court that the Company had not used the "market price" of sugar to price the syrup it supplied the bottlers. According to the Company, the bottlers still had the burden of proving by a preponderance of the evidence

---

**25.** The bottlers contend that our standard of review is plenary. For this proposition they cite to two cases: *International Union, UAW v. Mack Trucks, Inc.*, 917 F.2d 107 (3d Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991) and *Dent v. Cunningham*, 786 F.2d 173, 175 (3d Cir.1986). Reply Brief of Appellants/Cross–Appellees in Nos. 91–3496 & 91–3498 at 39. Neither of these cases supports their position. *Mack Trucks* dealt with the procedure a district court is bound to follow when it is deciding a case that has been remanded from the court of appeals. *Mack Trucks*, 917 F.2d at 110–11. This question appears similar to, but is definitely distinct from, the question of what a second district court judge may do in the wake of a first district judge's rulings. In the *Mack Trucks* situation, the district court is

bound by the decision of the court of appeals absent intervening Supreme Court precedent or an intervening in banc decision of the court of appeals. In our case, any law of the case question pertains to whether or not reargument on an issue may be heard in the district court, not whether the district court improperly ignored binding precedent of an appellate court. *See Schultz*, 737 F.2d at 345. Indeed, the Supreme Court has said the doctrine is one of discretion. *See Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 1391, 75 L.Ed.2d 318 (1983) ("Law of the case directs a court's discretion, it does not limit the tribunal's power."). *Dent* merely states our traditional standard of review for issues of law and has absolutely nothing to do with the law of the case. *Dent*, 786 F.2d at 175.

that the figures the Company used did not fit the *Coke III* definition of market price. The Company maintains that the list prices roughly fit the definition of "market price" and that the burden of proving that a lower "actual sales price" existed fell on the bottlers. According to the Company, the district court merely decided that the bottlers had not produced enough evidence to persuade it that the market price of sugar was anything other than the list price.

As discussed *supra*, the first district judge defined the term "market price" in *Coke III* as follows:

"Market price" as used in paragraph 7 of the Consent Decrees means an average of the price per pound for refined granulated sugar of the grade and in the packaging unit in which it is principally sold to industrial users f.o.b. the refinery, as made known to such industrial users upon inquiry prior to sale by the ten refineries in the United States with the largest capacity and output during the first seven days of each calendar quarter, less any discounts, allowances, or rebates from that price which are available to industrial users or are made known to them upon inquiry prior to sale. . . .

*Coke III*, 654 F.Supp. at 1418; *see supra* at 399. Judge Farnan reviewed this definition and commented that "Judge Schwartz's definition of market price states that 'market price' is a price made available upon inquiry prior to sale—*not* an actual sales price." *Coke VII*, 769 F.Supp. at 659. Although this was not always the price given upon inquiry, many refiners said that in response to an inquiry seeking their "market price" as defined by Judge Schwartz, they would give their list price. *Id.* at 657. The list price also met the two criteria that Judge Schwartz said were at the crux of the definition: that the syrup price be competitive and verifiable. *Id.* at 658; *Coke III*, 654 F.Supp. at 1407. While Judge Schwartz did stress the evidence showed that the Company sometimes was quoted

prices below list price, the definition of market price set out in *Coke III* put the burden on the bottlers to show that "there exists a verifiable price or range of prices, other than list price, which are available upon inquiry prior to sale." *Coke VII*, 769 F.Supp. at 659.

The opinion of the court in *Coke VII* demonstrates that Judge Farnan did not discard Judge Schwartz's definition but merely weighed the evidence the parties presented and concluded that the bottlers

have not proven by a preponderance of the evidence that there exists a verifiable price or range of prices, other than list price, which are available upon inquiry prior to sale. Phrased differently, [the unamended bottlers] have been unable to prove by a preponderance of the evidence any method for determining the "effective selling price" for the first seven days of any given quarter other than by averaging retrospectively the prices at which sales occurred during that period. An average sales price calculated after the fact is simply not the same thing as a price made available upon inquiry prior to sale.

*Id.* (footnote omitted).

The bottlers do not claim on appeal that the average sales price information was inadequate. Instead they argue that Judge Farnan reweighed the evidence and made findings of fact contrary to earlier findings made by Judge Schwartz. Considering the different inquiries the two district judges undertook, the painstaking review of the evidence in which the second district judge engaged, and his recognition of the *Coke III* definition of market price, we cannot hold that Judge Farnan erred in *Coke VII* when he decided that the Company's use of the refiners' list prices to determine the market price of sugar did not violate the parties' agreement.

We hold the district court did not violate the doctrine of the law of the case when it decided against the bottlers on Count Three. Accordingly, we will affirm the judgment that the Company did not violate the contracts and the Consent Decrees by

using the list price of sugar to determine the price of its sugar-sweetened syrup.[26]

### V.

In conclusion, we will affirm the judgment of the district court on Counts Two, Three and Four. We will affirm the judgment of the district court on Count One insofar as it concluded that the Company breached the contracts made in accord with the Consent Decrees, but reverse the award of damages and remand the case for further proceedings consistent with this opinion.

### APPENDIX

THIS AGREEMENT, made and entered into on this the 6th day of July, A.D. 1921, by and between COCA–COLA BOTTLING COMPANY, a corporation under the laws of the State of Tennessee, party of the first part, and THE COCA–COLA COMPANY, a corporation under the laws of the State of Delaware, party of the second part:

### WITNESSETH:

1: It being recognized that the primary obligation of all parties hereto, as well as all other individuals and Bottling Companies who employ the name Coca–Cola, in their corporate or trade name, is to promote the sale of Coca–Cola, and in consideration of the benefits to be derived by the parties to this instrument from the settlement of all matters of controversy between them in the above stated case, said case is hereby compromised and settled and this agreement is to be presented to the Circuit Court of Appeals and be made the judgment and decree of the proper Court.

2: The present contract between the said parties described in the pleadings in the above entitled cause, as hereby expressly modified and changed, shall remain of full force and effect, and is hereby agreed to be perpetual, and the same shall apply to the parties hereto and their respective successors and assigns; but no assignment shall be made by the party of the first part without the consent of the party of the second part, as provided in the original contract.

3: The said contract as hereby modified shall operate perpetually, but if abnormal or burdensome conditions or occurrence prevail and the said parties fail to agree on a modification of prices and terms to meet such abnormal or burdensome conditions or occurrence and to continue during the same, then either party shall have the right to demand arbitration as to the price and terms; and if they disagree as to whether or not abnormal or burdensome conditions or occurrence exist, then that question shall also be arbitrated.

. . . .

5: The parties hereto raise the contract price of Coca–Cola Bottlers Syrup as fixed by said existing contract to one dollar and seventeen and a half cents ($1.17) [sic] per gallon delivered as heretofore, including five cents (5¢) per gallon for advertising matter to be delivered at actual cost and freight expenses, and said party of the first part is hereby relieved and discharged from any and all obligations to spend anything for advertising; but it shall be bound to sell and deliver, at such actual cost, the same amount of advertising matter delivered to it by the party of the second part, to the actual Bottlers, as herein provided for. The party of the first part furthermore agrees to pay an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; same to include all possible increases in the cost of producing such syrup by the party of the second

---

26. Finally, we have also considered the bottlers' argument that they were entitled to a portion of the settlement the Company received from the antitrust law suit. We reject it as lacking in merit essentially for the reasons given by the district court in *Coke VI*, 696 F.Supp. at 87–90.

part other than may arise under, and as provided for by the arbitration clauses herein.

6: In order to promote the sale of Coca–Cola and enable the actual bottlers to compete with other beverages, the party of the first part hereby agrees to sell such syrup to the bottlers purchasing from it and not exceeding one dollar and thirty cents ($1.30) per gallon, including five cents (5¢) per gallon for advertising matter to be delivered, and an additional six cents (6¢) per gallon for such syrup for each advance of one cent (1¢) per pound in sugar above seven cents (7¢) per pound, and on the same basis for a fractional advance; the party of the first part hereby further agrees that any increase in price or change in terms growing out of any agreement or arbitration as provided under paragraph three hereof shall not be exceeded or increased by it in any sales it may make of said syrup to the bottlers purchasing the same from it.

7: It is agreed between the parties that the price of sugar is to be determined quarterly, January, April, July and October in each year, by averaging the market price of standard granulated sugar during the first week in such quarter, as quoted at the refineries by the ten refineries operating in the United States of America at the time, having the largest capacity and output.

. . . .

10: The party of the second part contracts that the syrup sold and furnished by it to the party of the first part is to be high grade standard Bottlers Coca–Cola Syrup, and shall contain not less than five and thirty two one-hundredths (5.32) pounds of sugar to each gallon of syrup.

. . . .

*Coke VI*, 696 F.Supp. at 65–66 n. 8. The Whitehead–Lupton decree contains two paragraphs not found in the Thomas decree that are immaterial to the resolution of this case. Except for these paragraphs, the decrees are identical. *Id.*